# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

TECHNICAL, PROFESSIONAL, AND OFFICEWORKERS
ASSOCIATION OF MICHIGAN v RENNER

Docket No. 162601.  Argued October 5, 2023 (Calendar No. 2).  Decided April 22, 2024.

Daniel L. Renner filed an unfair labor practice charge with the Michigan Employment Relations Commission (MERC) against the Technical, Professional, and Officeworkers Association of Michigan (the Union) alleging that the Union violated its duty of fair representation by refusing to represent him in a grievance with his employer unless Renner paid a fee for direct representation services.  Renner worked as a groundskeeper for Saginaw County and was part of a bargaining unit represented by the Union.  In 2017, Renner opted out of dues-paying membership with the Union.  In 2018, Renner filed a complaint with his employer, claiming that a coworker smoked around him, which was injurious to his health.  Renner's supervisor concluded that the claim was false and warned Renner that further incidents would lead to "progressive disciplinary action."  Renner then attempted to commence a formal grievance procedure under county policy, but his supervisor responded that Renner was precluded from invoking the procedure because he was a member of the bargaining unit represented by the Union, and under the collective bargaining agreement between the county and the bargaining unit, only the Union could pursue that grievance procedure.  Renner informed the president of the local chapter of the Union of his grievance, and a Union representative told Renner that he would have to pay a fee to obtain the Union's assistance with the grievance under its pay-for-service policy for nonmembers, which the Union had adopted in 2018.  The Union required Renner to pay $1,290 before it would provide assistance with his grievance, plus any additional actual costs incurred by the Union in representing Renner.  Renner refused to pay the fee, the Union did not provide assistance, and the deadline for pursuing the grievance under the collective bargaining agreement expired.  In the proceedings before MERC, Renner alleged that the Union had violated the public employment relations act (PERA), MCL 423.201 *et seq.*, by violating its duty of fair representation when it had demanded a fee in exchange for direct representation services.  An administrative law judge (ALJ) ruled in favor of Renner, concluding that the direct service fee was not permitted under PERA or the collective bargaining agreement and that it constituted an unfair labor practice.  MERC adopted the decision of the ALJ, and the Union appealed in the Court of Appeals.  The Court of Appeals, O'BRIEN, P.J., and M. J. KELLY and REDFORD, JJ., affirmed MERC's decision, agreeing that the Union's pay-for-services procedure violated PERA because it unlawfully discriminated against nonmembers of the Union and restrained employees from expressing their right to refrain from joining or assisting a labor union.  335 Mich App 293 (2021).  The Union sought leave to appeal in the Michigan Supreme

Court, which initially ordered oral argument on the application. 508 Mich 975 (2021). Following oral argument, the Supreme Court granted the Union's application in part. 510 Mich 1097 (2022).

In a unanimous opinion by Justice WELCH, the Supreme Court *held*:

Under the 2014 version of PERA, a public sector union that is the exclusive bargaining representative of a bargaining unit violates the union's duty of fair representation by requiring an employee in that bargaining unit who is not a member of the union to pay a fee for the union's representative services when the union's pay-for-service policy denies the nonmember employee access to the grievance administration process under the collective bargaining agreement.

1. The duty of fair representation was judicially crafted under the common law but derived from the National Labor Relations Act (NLRA), 29 USC 151 *et seq*. The United States Supreme Court has explained the duty by stating that when a union has been granted broad authority as the exclusive bargaining agent in the negotiation and administration of a collective bargaining contract, the union has a responsibility and duty to make a good-faith and honest effort to serve the interests of all members of a bargaining unit without hostility or discrimination toward any members, to exercise the union's discretion with complete good faith and honesty of purpose, and to avoid an arbitrary contract. Further, although a member of a bargaining unit does not have an absolute right to have their grievance taken to arbitration, the duty of fair representation does not allow a union to arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion. Michigan's PERA was modeled after the NLRA, and this Court affirmed in *Goolsby v Detroit*, 419 Mich 651 (1984), that PERA includes a duty of fair representation. Additionally, the Court held in *Goolsby* that under PERA, bad-faith conduct is not always required to establish a breach of the duty, and the union's failure to comply with collectively bargained grievance procedure time limits constitutes a breach of the duty of fair representation. While statutory unfair labor practices under PERA and the duty of fair representation are both components of Michigan's labor policies, their purposes are not identical. PERA includes a duty of fair representation that coexists with but is not subsumed within statutory unfair labor practices, and decisions of the National Labor Relations Board (NLRB) and the federal courts interpreting NLRA remain highly relevant persuasive authority for Michigan courts when evaluating alleged violations of the duty. However, the NLRA applies only to private sector unions. Until 2012, public sector employers and their unions could agree to require all employees in a collective bargaining unit to pay dues to the union covering the cost of collective bargaining and contract administration; such agreements were often referred to as "agency shop" agreements. But in 2012, the Legislature amended PERA and codified the right not to join a union. The 2012 amendments also prohibited a public employer or union from interfering with the exercise of this right, discriminating with regard to conditions of employment in order to encourage or discourage membership in a union, or requiring an individual to join a union or pay dues as a condition of employment. The 2012 amendments effectively eliminated agency shop agreements. In 2023, the Legislature repealed the 2012 amendments, but the dispute in this case predated the 2023 amendments and is governed by the 2014 version of PERA.

2. In the context of the private sector, the NLRB has considered the question before the Court many times, i.e., can private sector unions charge fees to nonunion employees to act as their representative in grievance procedures? In *Hughes Tool Co*, 104 NLRB 318 (1953), the NLRB

determined that a fee system for nonmembers violated the duty of fair representation because all employees were entitled to the impartial assistance of the certified representative in pursuing grievances and requiring payment by nonmembers before rendering this assistance was an abuse of the union's "privileged status" as the certified representative. The NLRB has affirmed its conclusion in *Hughes Tool* in subsequent cases addressing this issue.

3. Courts in at least two jurisdictions, *Cone v Nevada Serv Employees Union/SEIU Local 1107*, 116 Nev 473 (2000), and *Perry v Int'l Longshoremen Ass'n Local No 1414*, 295 Ga App 799 (2009), have upheld grievance fee policies instituted by public sector unions for nonmembers. Notably, in *Cone*, the Nevada Supreme Court held that a grievance fee policy that applied only to nonmembers of the union did not violate the duty of fair representation because the nonmember employees had the right to act on their own behalf with respect to any condition of employment, including pursuing grievances, and it did not violate the duty of fair representation because there was no discrimination or coercion in requiring nonmembers to pay reasonable costs associated with individual grievance representation. However, *Cone* and *Perry* both preceded the United States Supreme Court's decision in *Janus v AFSCME Council 31*, 585 US 878 (2018). In *Janus*, the Court struck down an Illinois statute authorizing public sector unions to charge nonmembers an agency fee as violative of the First Amendment right of nonmember public employees because it compelled them to "subsidize private speech on matters of substantial public concern." In *Janus*, the Court expressly overruled *Abood v Detroit Bd of Ed*, 431 US 209 (1977), which had upheld a similar statute. The *Janus* Court also held that agency fees could not be upheld on free-rider grounds. The Court concluded that the "unwanted burden" of representing nonmembers in disciplinary matters could be eliminated "through means significantly less restrictive of associational freedoms" than the imposition of agency fees. Regarding the unfairness of requiring unions to bear the duty of fair representation without an agency-fee policy, the Court noted that the duty was a "necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit."

4. Although the duty of fair representation does not necessarily mean that nonunion members of a bargaining unit must always be treated the same as union members, grievance administration is different. Grievance processing and arbitration are a critical aspect of the collective bargaining process through which unions wield significant power as the exclusive representatives of a bargaining unit. Through the bargaining process, unions and employers determine how employees can resolve disputes to enforce their contractual rights set forth in the collective bargaining agreement, and through the exercise of its discretionary authority as the exclusive representative, a union determines whether and how far to pursue each grievance. Thus, the way the grievance process is implemented by the exclusive representative of employees bears directly on the fruits of collective bargaining. The pay-for-service fee policy that the Union here seeks to uphold violates the duty of fair representation for several reasons. First, it exercises the Union's authority in a way that treats the prospective grievance of member and nonmember employees within the bargaining unit differently in substantial and material ways. Second, caselaw requires a union, when exercising its discretion as to whether a grievance should be processed or pursued, to at least make a preliminary determination as to the merits of the grievance before deciding whether to pursue it. The Union's policy here required no such initial determination and would allow the Union to ignore a nonmember's grievance unless the nonmember paid the fee. Third, the long line of decisions from the NLRB, beginning with *Hughes Tool*, correctly concluded

that charging only nonunion employees within a bargaining unit for services that union members receive as a part of their annual dues was antithetical to the exclusive representative status of unions. While the problem of free riders creates financial hardship for unions, as exclusive representatives, unions take on the responsibility of representing all employees, even those who withhold their financial support. The practical reality of a pay-for-services fee policy for grievance administration for nonunion members is that the exclusive representative of the bargaining unit is refusing representation to some of the employees in the group except as a hired agent. The duty of fair representation does not permit this form of discriminatory treatment of members and nonmembers in the absence of express legislation authorizing such fees by public sector unions. Additionally, the overturning of *Abood* by *Janus* calls into question the continued viability of the "fair share" principles relied on in *Cone* to uphold fee policies that applied exclusively to nonunion public sector employees. Further, the statute that the *Cone* court relied on differed from MCL 423.211, which has long been interpreted to require that the union must be the exclusive bargaining representative of the entire bargaining unit.

5. Although the Union argued that *Janus* authorizes its pay-for-service fee policy and removed the duty of fair representation for purposes of grievance processing, the Court's decision in *Janus* was not so broad. *Janus* suggested that charging individual nonmember employees fees for specific union services would survive a First Amendment challenge, but any speculation beyond that suggestion was dicta given that only the constitutional question was before the Court. *Janus* also did not analyze whether such fees would be consistent with the duty of fair representation. Moreover, in support of its suggestion, *Janus* cited two statutes authorizing fair share fees for costs associated with representative union services. Michigan's Legislature did not include similar express authorization for a fair share fee schedule in the applicable version of PERA, nor was any such authorization included in the 2023 amendments.

Part III of the Court of Appeals opinion affirmed to the extent that it found the Union's pay-for-service fee policy invalid, and Court of Appeals' analysis and conclusion that *Janus* did not hold that a union can unilaterally impose a fee for services only on nonmember employees also affirmed. Court of Appeals' analysis and holdings related to the alleged violations of § 9 and § 10 of PERA vacated. MERC's conclusion that the pay-for-service fee policy violated § 9 and § 10 of PERA also vacated, but MERC's decision otherwise affirmed.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED April 22, 2024

STATE OF MICHIGAN

SUPREME COURT

TECHNICAL, PROFESSIONAL, AND
OFFICEWORKERS ASSOCIATION OF
MICHIGAN,

      Respondent-Appellant,

v                               No. 162601

DANIEL LEE RENNER,

      Charging Party-Appellee.

BEFORE THE ENTIRE BENCH

WELCH, J.

A core tenet of labor relations in the United States is that a union owes the employees it represents a duty of fair representation. This duty reaches all employees in the bargaining unit, even if the employee is not a member of the union. Further, a key component of collective bargaining agreements between a union and an employer is the establishment of rules and procedures for how an employee must submit grievances to the

employer, which is typically through a union representative. Given these longstanding labor concepts, a union has traditionally had discretion to decide whether it is in the best interests of the entire bargaining unit to pursue a particular grievance while also having a duty to fairly represent all employees in the grievance process.

This case arrives to us in the wake of both significant changes to Michigan's public employment relations act (PERA), MCL 423.201 *et seq*., the statute that governs public sector labor relations, and the United States Supreme Court's decision in *Janus v AFSCME Council 31*, 585 US 878; 138 S Ct 2448; 201 L Ed 2d 924 (2018), which held that the First Amendment prohibits public sector unions from charging nonunion employees in a bargaining unit "agency fees" to cover their proportionate share of the union's costs for collectively bargaining on behalf of the entire unit. In 2018, the appellant union implemented a pay-for-services fee policy that required bargaining unit employees who had opted not to pay union dues to pay a fee to the union before the union would review and process a matter through the collective bargaining agreement's grievance process. The Legislature has not expressly authorized this form of a fee policy applicable to only nonunion members of a bargaining unit, and similar policies have almost uniformly been rejected across the country. In the absence of legislative authorization, the fee policy at issue violates the union's duty of fair representation and is invalid regardless of whether it also violates MCL 423.209 or MCL 423.210. Accordingly, as explained more thoroughly in this opinion, we affirm in part and vacate in part the judgment of the Court of Appeals and the decision of the Michigan Employment Relations Commission.

## I.  BACKGROUND

### A.  FOUNDATIONAL LEGAL BACKGROUND

To understand the facts of this case and the parties' legal dispute, it is first helpful to understand the nature and evolution of labor relations in Michigan.  Labor relations for public sector employers with unionized workforces is governed by PERA.  1947 PA 336.  PERA requires that a union selected by the majority of employees within a bargaining unit act as the exclusive bargaining representative for employees in that unit with respect to compensation, hours, and other terms and conditions of employment.  MCL 423.211.

First enacted in 1947, PERA initially provided "public employees . . . relatively few of the organizational privileges which their counterparts in the private sector enjoyed." *Lamphere Sch v Lamphere Federation of Teachers*, 400 Mich 104, 127; 252 NW2d 818 (1977).  In 1965, the Legislature amended PERA to explicitly grant public employees the statutory right to engage in collective bargaining, and additional amendments in 1973 authorized the assessment of "agency fees" upon all members of a collective bargaining unit.  See 1965 PA 379; 1973 PA 25; *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 49-50; 214 NW2d 803 (1974).  From 1973 until 2012, both public sector employers and their unions could agree to require all employees in a collective bargaining unit to pay dues to the union to cover the cost of collective bargaining and contract administration.  These agreements were known as "agency shop" agreements, and until recently, they had been deemed constitutionally permissible.  See *Abood v Detroit Bd of Ed*, 431 US 209, 211; 97 S Ct 1782; 52 L Ed 2d 261 (1977), overruled by *Janus*, 585 US 878.  *Abood* made clear that the First Amendment prohibits public sector unions from charging to objecting members of a bargaining unit mandatory fees that support political work but held that the

3

union could still require nonunion employees to pay a service charge to cover the cost of collective bargaining work from which all employees benefited.[1] *Abood*, 431 US at 232-236. As a result, the law provided that a public sector employee did not have to be a union member simply because their bargaining unit was represented by a union, but the employer and union could still agree that the nonunion employee had to pay a "fair share" amount to the union for the collective representation provided by the union.

In 2012, Michigan's Legislature significantly overhauled PERA when it enacted Public Acts 348 and 349 of 2012.[2] In addition to codifying the right not to join a union, the 2012 amendments provided that:

> (2) No person shall by force, intimidation, or unlawful threats compel or attempt to compel any public employee to do any of the following:
>
> (a) Become or remain a member of a labor organization or bargaining representative or otherwise affiliate with or financially support a labor organization or bargaining representative.
>
> (b) Refrain from engaging in employment or refrain from joining a labor organization or bargaining representative or otherwise affiliating with or financially supporting a labor organization or bargaining representative. [MCL 423.209(2), as amended by 2012 PA 349.]

The 2012 amendments of MCL 423.210 also prohibited a public employer or union from "interfer[ing] with, restrain[ing], or coerc[ing] public employees" in the exercise of these new rights, MCL 423.210(1)(a) and (2)(a); prohibited discrimination "in regard to hire, terms, or other conditions of employment to encourage or discourage membership in

---

[1] Such service charges are often referred to as "agency fees" or "fair-share fees." See *Janus*, 585 US at 935 (Kagan, J., dissenting).

[2] This legislation has been colloquially referred to as Michigan's "right to work" law.

a labor organization," MCL 423.210(1)(c); and provided that (subject to police and fire department exemptions in Subsection (4)) an individual must not be required to join a union or pay dues as a condition of employment, MCL 423.210(3).[3]

The 2012 PERA amendments had the effect of eliminating agency shop agreements.[4] The end result was that employees could choose not to join a union or financially support a union, even if the union was responsible for a bargaining unit with nonunion employees and such employees received benefits from the collective bargaining agreement. In 2023, the Legislature voted to repeal the 2012 amendments, and the Governor signed the repeal into law. 2023 PA 9; 2023 PA 114. As a result, PERA effectively returns to its pre-2012 status once the new law goes into effect.[5]

That said, public sector unions are treated differently than their private sector counterparts. In *Abood*, the United States Supreme Court found that fair-share fees could be charged to nonunion members of a public sector bargaining unit and that such fees did not violate the First Amendment. *Abood*, 431 US at 232-236. In 2018, the Court revisited this holding and found otherwise. Specifically, in *Janus*, the Court held that the First Amendment's freedom-of-association protection prohibits public sector unions (or public

---

[3] Further amendments were made to provisions of PERA by 2014 PA 414 that are not directly implicated in this case. The 2014 iteration of PERA was in effect at all times relevant to this case and is relevant to the current legal dispute; all references in this opinion to PERA are to the 2014 law unless otherwise stated.

[4] An exception was written into PERA for police and fire department employees and the unions representing them. See MCL 423.210(4).

[5] This dispute predates the 2023 amendments. As noted, the 2014 version of PERA is the version of the law applicable to this case.

5

sector employers) from requiring employees to pay fair-share agency fees. *Janus*, 585 US at 914-916. Thus, despite the repeal of the 2012 amendments, public sector units must still abide by *Janus*.

## B. FACTS GIVING RISE TO THE UNFAIR LABOR PRACTICE CLAIM

Daniel Renner, the charging party, is employed by Saginaw County as a groundskeeper. The Technical, Professional, and Officeworkers Association of Michigan (the Union) represents Renner's bargaining unit. In 2017, Renner opted out of dues-paying membership with the Union as was permitted by MCL 423.209 and MCL 423.210.

The events giving rise to the present dispute occurred in 2018. In September 2018, Renner submitted a complaint to the County's director of maintenance, Bernard Delaney, Jr., claiming that another employee smoked around Renner and that this negatively affected his health. Delaney concluded that Renner's complaint was a false claim and warned Renner that "[a]ny further incidents will lead to progressive disciplinary action, up to and including discharge." Renner sent Delaney a document the next day that purported to invoke a specific formal grievance procedure under County Policies, Category 300, Number 337, Policy 6.1.1. On September 26, 2018, Delaney responded to Renner in writing, noting that Policy 6.1.1 precluded Renner from invoking the specific grievance procedure because he was a member of a bargaining unit represented by the Union. However, Delaney went on to state that he had reviewed Renner's submission, and he was denying the grievance on the merits.

On the same day that Renner submitted the grievance to Delaney, he also informed the president of the local chapter of the Union of the grievance and expressed his desire to

receive union representation. A Union representative responded and told Renner that if he needed assistance with the grievance, he would have to pay fees for this service to the local chapter in accordance with the Union's internal rules and procedures. The representative pointed to an internal procedure and pay-for-service fee policy that the Union had adopted by resolution on July 23, 2018. Specifically, the policy states that nonunion members of a bargaining unit "shall be required to pay, in advance, for" representation services, including but not limited to: (1) internal investigatory proceedings, (2) employer administrative proceedings, (3) state administrative proceedings, (4) consultations with a union representative or union legal counsel, and (5) grievance step meetings, arbitration, and post-arbitration matters. The Union reserved the right to determine costs, expenses, and fees on a case-by-case basis and required employees to pay the difference if the actual cost exceeded the anticipated amount.

In short, under the Union's internal policy, bargaining unit members who were not dues-paying members of the Union were required to pay a separate fee for direct representation services but not collective labor representation services. The Union's pay-for-service policy defines "direct labor representation services" to include "representation of a bargaining unit member in an individual capacity, in employment related issues including, but not limited to . . . grievance representation and arbitration, and administrative representation[.]" According to the Union, the fee policy ensures that nonunion members of a bargaining unit pay a fair share of the expenses associated with direct representation that would otherwise be covered by a union member's annual dues over time. Under the policy, an employee is prohibited from joining the Union during the pendency of an employment dispute, but the Union has discretion to waive this provision.

7

If the Union elects to waive the prohibition, then an employee would be required to pay union dues as a new member but would not have to pay a separate fee for direct representation services. The Union's legal counsel further advised Renner that "the only process allowed to pursue a grievance, through the [collective bargaining agreement] steps, is via the Union" and noted that the County could not directly respond to grievances with individual employees in bargaining units covered by the collective bargaining agreement.

The Union required Renner to pay $1,290, an estimate of the cost of its services, in advance before it would assist him with the next step in the grievance process. If the actual amount of the services provided exceeded the amount of the estimate, the Union would require payment of those costs by Renner "prior to any continuation of services." Additional steps, such as pursuing binding arbitration, would require additional payment by Renner. Renner refused to pay the fee. Accordingly, the Union took no further steps to assist Renner with his grievance, and the default deadline under the collective bargaining agreement to proceed with the grievance process expired.

## C. ADMINISTRATIVE PROCEEDINGS

Renner filed an unfair labor practice challenge with the Michigan Employment Relations Commission (MERC) under PERA in October 2018. Specifically, Renner alleged that the Union violated its duty of fair representation by demanding a fee in exchange for direct representation services. The Union filed for summary disposition. It did not dispute the underlying facts but instead argued that charging such a fee was lawful following the decision of the United States Supreme Court in *Janus*. According to the Union, *Janus* "remove[d] the duty [of fair representation] owed to a 'member of a

bargaining unit' that is not a member of the union, if direct labor representation services are requested and the individual refuses to pay for those services."

An administrative law judge (ALJ) disagreed with the Union and ruled in favor of Renner. The ALJ relied heavily on decisions from the National Labor Relations Board (NLRB) concerning analogous provisions in the National Labor Relations Act (NLRA), 29 USC 151 *et seq*., which MERC had historically followed. The ALJ further distinguished one judicial decision to the contrary, *Cone v Nevada Serv Employees Union/SEIU Local 1107*, 116 Nev 473; 998 P2d 1178 (2000). In that case, the Nevada Supreme Court found that a direct service fee could be charged by the union for grievance representation, but the ALJ here found that Nevada law was unique because it expressly granted an individual employee the right to present a grievance to their employer, to have it adjusted without assistance from the union, and to compel the employer to deal directly with the employees and their personal attorneys. As a result, employees in Nevada had a choice of how to press forward with a grievance in a union workplace—either with union assistance or without.

In contrast, the ALJ concluded that neither PERA nor the applicable collective bargaining agreement permitted the direct service fee in Michigan because neither permitted an employee in a unionized workplace to communicate directly with an employer about a grievance. Only the Union could process a grievance. Accordingly, the ALJ recommended that MERC hold that (1) the Union's pay-for-service fee policy violated § 10(2)(a) of PERA because it unlawfully discriminated against nonunion members and restrained employees from exercising their right under § 9 of PERA to refrain from joining or assisting a labor organization and (2) the Union violated its duty of fair representation

9

by refusing to file or process Renner's grievance unless he paid a fee for direct representation, which discriminated against nonmembers.

MERC agreed with the ALJ that the Union's fee policy constituted an unfair labor practice, and it adopted the ALJ's decision and recommended order, thus rejecting the Union's arguments under *Janus*. MERC further rejected the Union's state and federal constitutional arguments that the Union was being forced to associate with a nonmember against its will on the basis that the duty of fair representation negated such First Amendment claims.

## D. JUDICIAL PROCEEDINGS

The Union appealed MERC's decision in the Court of Appeals pursuant to MCL 423.216(e) and Const 1963, art 6, § 28. That Court affirmed MERC's decision in a published opinion. *Technical, Professional, and Officeworkers Ass'n of Mich v Renner*, 335 Mich App 293; 966 NW2d 693 (2021).

The Court first addressed and rejected the Union's arguments that the pay-for-service fee policy did not violate an express provision of PERA. The panel emphasized that MCL 423.209 gave public employees the right to organize or join collective bargaining units or, conversely, to refrain from doing so. *Id*. at 302-303. Conversely, MCL 423.210(1)(a) prohibits a public employer from "interfering with, restraining, or coercing public employees in the exercise of their rights guaranteed in section 9," and MCL 423.210(2)(a) "prohibits labor organizations from restraining or coercing public employees in the exercise of" the rights guaranteed in § 9, "but it does not impair the right of a labor

10

organization to prescribe its own rules with respect to the acquisition or retention of membership." *Renner*, 335 Mich App at 303 (quotation marks and citations omitted).

The panel agreed with MERC that the pay-for-services procedure violated MCL 423.210(2)(a) because it unlawfully discriminated against nonmembers of the Union and restrained employees from exercising their right to refrain from joining or assisting a labor organization under MCL 423.209. *Id*. at 303-304. The Court rejected the Union's argument that the pay-for-service fee policy was authorized by MCL 423.210(2)(a), which allowed a labor organization to set its own rules " 'with respect to the acquisition or retention of membership' " because the Union's rule applied to only nonunion employees and did not govern the acquisition or retention of membership. *Id*. at 304-305, quoting MCL 423.210(2)(a). The panel concluded that the primary purpose of the pay-for-service fee policy was to require nonunion collective bargaining unit members to pay for direct representation services, and it advanced this purpose by restraining or coercing nonmember employees in the exercise of their rights under MCL 423.209. *Renner*, 335 Mich App at 304-305. The panel also rejected the Union's argument that the pay-for-service policy was an internal rule permitted by MCL 423.210(2)(a) and was not unlawful because the fee was not required as a "condition of obtaining or continuing public employment" MCL 423.210(3). *Id*. at 306-307. The panel further held that even if the policy was an internal rule, the fee would be unenforceable as an impermissible form of restraint or coercion on an employee's right under MCL 423.209 to refrain from joining a union. *Id*.

As to the duty of fair representation, the Court of Appeals acknowledged that MCL 423.211 has been interpreted as imposing a duty of fair representation on labor organizations representing public sector employees that is analogous to the duty imposed

11

by the NLRA on labor organizations representing private sector employees. *Id*. at 307-308, citing *Goolsby v Detroit*, 419 Mich 651, 661 n 5; 358 NW2d 856 (1984); *Ford Motor Co v Huffman*, 345 US 330, 337; 73 S Ct 681; 97 L Ed 1048 (1953). The Court went on to reject the Union's argument that the duty of fair representation was not violated on the basis that nonunion members are treated equally for collective bargaining purposes. *Renner*, 335 Mich App at 308-309.

The Court noted that the Union, as the exclusive representative of Renner's bargaining unit, had negotiated a grievance process that governed Renner's employer and all members of the bargaining unit. *Id*. at 309. Therefore, all members of the unit were required to use the negotiated procedure, and Renner had unsuccessfully attempted to invoke individual grievance rights under MCL 423.211 of PERA. *Renner*, 335 Mich App at 309-310. Thus, opined the Court, the Union's pay-for-service policy "effectively foreclosed a nonunion employee's ability to use the grievance process absent payment for services," *id*. at 309, or to refrain from joining the union before there was a need to invoke the grievance procedure, see *id*. at 310-311. Like MERC, the Court of Appeals also rejected the Union's arguments that *Janus* allowed for a pay-for-services regime and that the Nevada Supreme Court's *Cone* decision should be followed in Michigan. *Id*. at 311-318. Finding no errors of law, the Court of Appeals affirmed MERC's decision.[6]

The Union then sought leave to appeal in this Court, and we initially ordered oral argument on the application. *Technical Professional & Officeworkers Ass'n of Mich v*

---

[6] The Court of Appeals also rejected the Union's argument that the MERC decision violates the Union's First Amendment rights to freedom of association. *Renner*, 335 Mich App at 318-320. This issue was not included in this Court's order granting leave to appeal.

*Renner*, 508 Mich 975 (2021). After we heard oral argument on the application in October 2022, the Court granted the Union's application for leave to appeal in part and directed the parties to brief the following issues:

> (1) what is the difference between the common-law analysis of the duty of fair representation and the statutory analysis of "coercion" and "restraint" under the public employment relations act (PERA), MCL 423.201 *et seq.*, and whether the outcome in this case will differ based on which analysis is used; (2) whether the fee schedule in this case violates §§ 9 and 10 of PERA (MCL 423.209; MCL 423.210); and (3) whether the fee schedule in this case violates the common-law duty of fair representation. [*Technical Professional & Officeworkers Ass'n of Mich v Renner*, 510 Mich 1097, 1097 (2022).]

## II. STANDARD OF REVIEW

The scope of judicial review of a decision from MERC concerning alleged unfair labor practices varies depending on whether the alleged error is one of fact or law. Const 1963, art 6, § 28 requires the Court to determine whether the "final [administrative] decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record." The Legislature has further provided that MERC's findings of fact, "if supported by competent, material, and substantial evidence on the record considered as a whole[,] shall be conclusive." MCL 423.216(e).

We have long recognized that MERC has the "administrative expertise to entertain and reconcile competing allegations of unfair labor practices and misconduct under the PERA." *Kent Co Deputy Sheriffs Ass'n v Kent Co Sheriff*, 463 Mich 353, 359; 616 NW2d 677 (2000), quoting *Rockwell v Crestwood Sch Dist*, 393 Mich 616, 630; 227 NW2d 736 (1975). This Court gives "respectful consideration" to the construction of a statute by an

agency charged with implementation and enforcement of the statute such that an agency's interpretation will not be overruled absent "cogent reasons" for doing so, but "the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *In re Rovas Complaint Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008). Therefore, MERC's legal rulings are reviewed de novo and may be set aside if "they violate a constitutional or statutory provision or they are based on a substantial and material error of law." *Grandville Muni Executive Ass'n v City of Grandville*, 453 Mich 428, 436; 553 NW2d 917 (1996). See also *Macomb Co v AFSCME Council 25*, 494 Mich 65, 77; 833 NW2d 225 (2013); *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 323; 550 NW2d 228 (1996); MCL 24.306(1)(a) and (f).

III. ANALYSIS

A. THE DUTY OF FAIR REPRESENTATION

The duty of fair representation has a long history in both federal and Michigan labor law. This duty was derived from the NLRA in a series of decisions from the United States Supreme Court over 60 years ago. See *Steele v Louisville & Nashville R Co*, 323 US 192; 65 S Ct 226; 89 L Ed 173 (1944); *Tunstall v Brotherhood of Locomotive Firemen*, 323 US 210; 65 S Ct 235; 89 L Ed 187 (1944); *Ford Motor Co*, 345 US 330. We have previously described the duty of fair representation under federal law as a hybrid of statutory and common law because it was judicially crafted under the common law but derived from the NLRA. See *Demings v City of Ecorse*, 423 Mich 49, 59; 377 NW2d 275 (1985) ("The right is the product of a federal common law of statutory origin. How this hybrid is classified is not of critical importance.") (quotation marks and citation omitted). In

14

*Humphrey v Moore*, 375 US 335, 342; 84 S Ct 363; 11 L Ed 2d 370 (1964), the United States Supreme Court explained that when a union has been granted "broad authority" as the "exclusive bargaining agent in the negotiation and administration of a collective bargaining contract," the union has a "responsibility and duty" to make a good faith and honest effort to serve the interests of all members of a bargaining unit without hostility or discrimination to any such members, to exercise the union's discretion with "complete good faith and honesty of purpose," and to avoid an arbitrary contract. (Quotation marks and citation omitted.)

The United States Supreme Court later clarified that the duty of fair representation did not allow a union to "arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," even though an individual member of a bargaining unit did not have an "absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Vaca v Sipes*, 386 US 171, 191; 87 S Ct 903; 17 L Ed 2d 842 (1967). See also *id*. at 194 ("In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances."). Thus, at its core, the duty of fair representation entitles all members of a bargaining unit to be treated in a generally fair and nonarbitrary manner by the union that represents them.

It is well established that Michigan's PERA was modeled after the NLRA. See, e.g., *Rockwell*, 393 Mich at 635-636. In *Goolsby*, 419 Mich at 660 n 5, this Court affirmed

15

that PERA, like the NLRA, includes a duty of fair representation.[7] The Court's holding was largely based upon MCL 423.211 of PERA, which, like the NLRA, makes a labor organization the exclusive bargaining representative of all nonexempt employees in a covered bargaining unit.[8] Relying heavily on federal precedent, such as *Humphrey* and *Vaca*, we specifically held in *Goolsby* that:

> (1) PERA impliedly imposes on labor organizations representing public sector employees a duty of fair representation; (2) bad-faith conduct is not always required to make out a breach of that duty; (3) the conduct prohibited by the duty of fair representation includes (a) impulsive, irrational or unreasoned conduct, (b) inept conduct undertaken with little care or with indifference to the interests of those affected, (c) the failure to exercise discretion, and (d) extreme recklessness or gross negligence; (4) absent a reasoned, good-faith, nondiscriminatory decision not to process a grievance, the failure of a labor organization to comply with collectively bargained grievance procedure time limits constitutes a breach of the duty of fair representation; and (5) in this case, the union's inexplicable failure to comply

---

[7] MERC has also held that this duty of fair representation is imported through PERA § 10(2)(a). See *Waverly Ed Supp Personnel Ass'n*, 30 Mich Pub Emp Rep 50 (2017) (Case Nos. CU16 H-044 and CU16 H-046 to H-049) ("The Commission [MERC] has interpreted Section 10(2)(a) as incorporating the duty of fair representation . . . .").

[8] MCL 423.211 provides that:

> Representatives designated or selected for purposes of collective bargaining by the majority of the public employees in a unit appropriate for such purposes, *shall be the exclusive representatives of all the public employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment,* and shall be so recognized by the public employer: Provided, That any individual employee at any time may present grievances to his employer and have the grievances adjusted, without intervention of the bargaining representative, if the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect, provided that the bargaining representative has been given opportunity to be present at such adjustment. [Emphasis added.]

with the grievance procedure time limits indicates inept conduct undertaken with little care or with indifference to the interests of plaintiffs, which could have reasonably been expected to foreclose plaintiffs from pursuing their grievance further. As a result, the union breached its duty of fair representation to plaintiffs. [*Goolsby*, 419 Mich at 681-682.]

*Goolsby* also reaffirmed the longstanding principle that because of the overlap between PERA and the NLRA, we look to decisions from federal courts and the NLRB that construe similar provisions and principles under the NLRA for guidance. See *id*. at 660 n 5. See also *Rockwell*, 393 Mich at 636 ("In construing the Michigan labor mediation act and the PERA, this Court has frequently been guided by the construction placed on the analogous provisions of the NLRA by the NLRB and the Federal courts."); *Detroit Police Officers Ass'n*, 391 Mich at 53 ("Although we cannot state with certainty, it is probably safe to assume that the Michigan Legislature intentionally adopted § 15 PERA in the form that it did with the expectation that MERC and the Michigan courts would rely on the legal precedents developed under NLRA, § 8(d) to the extent that they apply to public sector bargaining.").

While there is substantial overlap between the duty of fair representation and statutorily proscribed unfair labor practices, they are not identical. The duty of fair representation is broader, and thus requires more of a union than avoidance of statutory unfair labor practices; accordingly, the duty of fair representation should not be defined or limited by those statutory proscriptions. See, e.g., *Breininger v Sheet Metal Workers Int'l Ass'n Local No 6*, 493 US 67, 86; 110 S Ct 424; 107 L Ed 2d 388 (1989) ("[T]here is no reason to equate breaches of the duty of fair representation with unfair labor practices, especially in an effort to *narrow* the former category. . . . Pegging the duty of fair representation to the [NLRB's] definition of unfair labor practices would make the two

redundant, despite their different purposes, and would eliminate some of the prime virtues of the duty of fair representation—flexibility and adaptability.").

While statutory unfair labor practices under PERA and the duty of fair representation are both components of Michigan's statewide labor policies, their purposes are not identical. Statutory unfair labor practices are primarily aimed at the Legislature's interest in effectuating and implementing state labor policies, while the duty of fair representation seeks to prevent unions from perpetrating wrongful or arbitrary conduct against individual employees within a bargaining unit. See *Chauffeurs, Teamsters and Helpers Local 391 v Terry*, 494 US 558, 573; 110 S Ct 1339; 108 L Ed 2d 519 (1990) ("Unlike the unfair labor practice provisions of the NLRA, which are concerned primarily with the public interest in effecting federal labor policy, the duty of fair representation targets 'the wrong done the individual employee.' ") (citation omitted); *Vaca*, 386 US at 182 n 8; see *Goolsby*, 419 Mich at 681. Thus, an action that is not an unfair labor practice could still be a violation of the duty of fair representation. Such distinctions were critical to this Court's previous holding that while MERC has exclusive original jurisdiction over statutory unfair labor practice claims, it shares concurrent jurisdiction with the circuit court over alleged violations of the duty of fair representation. *Demings*, 423 Mich at 57-58, 63-64. "In this state, a person claiming that a labor organization has breached its duty of fair representation can institute an administrative or a judicial proceeding, the former by filing an unfair labor practice charge with the NLRB or the MERC, the latter by filing a complaint with a federal district or state circuit court." *Id*. at 63-64, quoting *Goolsby*, 419 Mich at 665 n 6.

The duty of fair representation has long been and continues to be an important labor law principle in Michigan. We reaffirm that PERA includes a duty of fair representation that coexists with but is not subsumed within statutorily proscribed unfair labor practices. We also reaffirm that decisions of the NLRB and federal court concerning the duty of fair representation under the NLRA are highly relevant persuasive authority that should be consulted when evaluating alleged violations of the duty.

## B. CHARGING NONUNION EMPLOYEES FOR DIRECT REPRESENTATIVE SERVICES AND THE DUTY OF FAIR REPRESENTATION

Before this case, this Court, the Court of Appeals, and MERC had yet to consider whether charging a fee to public sector bargaining unit members who are not members of the relevant union for direct representation services is consistent with the duty of fair representation. Given that this is an issue of first impression in Michigan, we look to precedent from the NLRB and decisions from other courts concerning similar questions for guidance.

## 1. NATIONAL LABOR RELATIONS BOARD DECISIONS

The NLRB, the administrative agency that oversees private sector labor disputes, has considered the question before this Court several times: can unions representing employees in the private sector charge fees to nonunion employees for representation in grievance procedures? The issue was first presented in *Hughes Tool Co*, 104 NLRB 318 (1953). In that case, one chapter of the Independent Metal Workers Union, Local 1, represented the white employees at a tool plant and another union chapter, Local 2,

19

represented the Black employees.[9]  *Id*. at 319.  The NLRB had certified both chapters as joint bargaining representatives.  *Id*.  Local 1 announced a policy that required employees who were not members of the union to pay "$15 for each grievance and $400 for each arbitration proceeding" in which the union would act as their representative; members of Local 1 were not required to pay a fee beyond their monthly dues, and Local 2 did not institute the fee system.  *Id*. at 319-320.

An action seeking decertification of the Metal Workers Union was commenced by the International Association of Machinists alleging, in relevant part, that the grievance fee system violated the union's duty of fair representation.  *Id*. at 320.  The Machinists specifically argued that the Metal Workers Union "misused, and continues to misuse, the certification as exclusive bargaining representative by failing to process and present grievances of all members of the bargaining unit on a nondiscriminatory basis."  *Id*. at 318-319.  The Machinists explained that "the certified bargaining representative owes a duty of nondiscriminatory representation of all employees in the bargaining unit whether or not they are members," and this duty was "violated by a [Metal Workers Union] policy which denies the services of the [union] representative to nonmembers except upon the payment of discriminatory fees, thereby punishing and coercing those individuals into joining" the Metal Workers Union.  *Id*. at 320.  The Metal Workers Union countered that the fee system

---

[9] Although the National Labor Union, the first national labor federation in the United States, declared that it would admit members regardless of color or nationality as early as 1866, segregation within unions was an unfortunate but common practice until after passage of the Civil Rights Act in 1964, 42 USC 1981 *et seq*.  See University of Maryland University Libraries, *African-American's Rights* <https://exhibitions.lib.umd.edu/unions/social/african-americans-rights> (accessed December 4, 2023) [https://perma.cc/STN2-7PRL].

was a "nondiscriminatory method of equitably sharing the costs of representation," thus curing a free-rider problem, and the prior system weighed down grievance processers with frivolous claims. *Id.* The employer was located in Texas, which had a statute prohibiting compulsory union membership. *Id*. at 329.

The NLRB, in *Hughes Tool Co*, first focused on § 9 of the NLRA, which like MCL 423.211, provides that the union is the "exclusive representative" of employees within the relevant bargaining unit.[10] *Id*. at 325. The NLRB found that this duty did not permit discrimination on the basis of membership or nonmembership in a union and focused on the prominent role that "grievance handling plays in the representation of employees," given that "viewed in the larger aspect, [it] constitutes, to a great degree, the actual administration of a collective-bargaining contract." *Id*. at 325-326. While the 1947 amendments of § 9 of the NLRA allowed some employees to present grievances to employers directly under some circumstances, this did not lessen the union's responsibility

---

[10] At the time that *Hughes Tool Co* was decided, § 9(a) of the NLRA, 29 USC 159(a), was nearly identical to § 11 of PERA and provided:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, *shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to* rates of pay, wages, hours of employment, or *other conditions of employment*: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment. [Emphasis added.]

21

"concerning those grievances on which its aid is requested," and thus the duty of fair representation still required a union to act "impartially and without discrimination to accept and process all grievances placed in its hands by the employees it represents." *Id.* at 327. As a result, the NLRB concluded that the grievance fee system for nonmembers violated the duty of fair representation because

> all employees in an appropriate unit are entitled, upon their request, to the impartial assistance of the certified representative in the filing and adjustment of grievances. The duty of the certified representative to render such impartial assistance is clearly evaded where some employees are forced to pay a price for such help or to forego it entirely. The latter result is precisely what occurs under the fee schedule set up by the [Metal Workers Union]. [*Id.*]

The NLRB specifically rejected the Metal Workers Union's arguments to the contrary:

> The defense of the [Metal Workers Union]—that it does not "refuse" such assistance as certified representative but merely requires payment for it— begs the question. It is the employee's option alone as to whether the services of the representative are to be used in his behalf. By demanding the payment of a $15 or $400 fee by nonmembers as a prerequisite to their obtaining the assistance they are entitled to as employees in the unit and refusing the representation if not paid, the [Metal Workers Union] has abused the privileged status it occupies as certified representative by using that status as a license to grant or deny representation according to its own arbitrary standards.
>
> . . . While the question of employees who accept representation without sharing in its expenses is a historic and troublesome problem we do not consider that the measures placed in effect by the [Metal Workers Union] present a permissible solution. The [Metal Workers Union], in realistic terms, is claiming the privilege of refusing representation to some of the employees in a group except as a hired agent. Thus, it will assist, in grievance proceedings, in enforcement of rights accruing to an employee under a collective-bargaining contract only if that employee will join its organization or make a substantial payment. The [Metal Workers Union] is barred, by the law of the State of Texas, from obtaining compulsory membership. We do

22

not believe that, in the alternative, it may require a fee from nonmember employees for services which are due the latter as a matter of right. By adopting such a procedure, the [Metal Workers Union] has, in effect, taken the position that it will only represent its members in the important area of contract administration. [*Id*. at 328-329 (citation omitted).]

As to the contention of excessive frivolous grievances, the NLRB believed it sufficient that the Metal Workers Union, like other certified unions, had the right to refuse to process clearly meritless grievances. *Id*. at 329.

This issue of charging nonunion employees separate fees for grievance processing services was brought to the NLRB several more times in the decades following *Hughes Tool Co*. The NLRB consistently reached the same conclusion. See, e.g., *Int'l Ass'n of Machinists, Local Union No 697 (The HO Canfield Rubber Co)*, 223 NLRB 832, 834 (1976) ("In conclusion, we find that Respondent, by charging only nonmembers for grievance representation, has discriminated against nonmembers. We further find that a grievance procedure is vital to collective bargaining and that grievance representation is due employees as a matter of right."); *Plumbers, Local 141*, 252 NLRB 1299 (1980) (affirming the ALJ's ruling premised on *Hughes Tool Co* and adopting the recommended order); *Columbus Area Local, American Postal Workers Union (Postal Serv)*, 277 NLRB 541, 543 (1985) (holding that where legislation prohibiting compulsory union membership or payment of union dues is applicable, "in the absence of a valid [legislative] union-security clause, a union may not charge nonmembers for the processing of grievances or other services"); *Furniture Workers Div, Local 282 (Davis Co)*, 291 NLRB 182, 183 (1988) ("Where state law prohibits a labor organization from compelling membership[,] a union may not require a fee for vital collective bargaining services, including grievance processing, which is due nonmembers as a matter of right[.]").

The NLRB again considered this issue and reached the same conclusion as recently as 2015 in *United Steel, Paper & Forestry, Rubber, Mfg, Energy, Allied Indus & Serv Workers Int'l Union, Local 1192, AFL-CIO, CLC (Buckeye Florida Corp)*, 362 NLRB 1649 (2015). *Buckeye Florida Corp* is significant because the NLRB affirmed the decision of an ALJ that had specifically rejected the applicable union's reliance on the Nevada Supreme Court's decision in *Cone*, 116 Nev 473.

This unbroken line of NLRB precedent makes clear that under the NLRA, charging nonunion members of a bargaining unit a separate fee for the processing of grievances and direct representation services in grievance proceedings is a violation of the duty of fair representation. The NLRB has also long acknowledged the existence of free-rider problems caused by non-dues-paying members of collective bargaining units and the equitable and financial concerns raised by labor organizations. However, it has consistently held that, in the absence of a union security clause permitted by legislation in states that otherwise prohibit compulsory payment of union dues or membership, a union cannot charge nonunion members of a bargaining unit a fee for grievance representation.

## 2. RELEVANT PUBLIC SECTOR PRECEDENT

The NLRA applies to only private sector unions. While the cases in the prior section set forth precedent regarding the legality of charging fees to nonunion members for the processing of grievances and representation in grievance proceedings in the private sector, cases involving the same issue in the public sector are much sparser.

The Nevada Supreme Court's decision in *Cone* directly addressed this issue. In *Cone*, the court was faced with a grievance fee policy that, like the one under review by

this Court, charged nonunion members a fee for direct representation services in grievance proceedings. The court in *Cone* acknowledged that the relevant version of the applicable statute, Nev Rev Stat 288.027, defined a bargaining agent "as the exclusive representative of all local government employees in the bargaining unit for purposes of collective bargaining."[11] *Cone*, 116 Nev at 477. The court determined the "mere inclusion of the word 'exclusive' in and of itself prohibits a union from charging nonunion members service fees for individual grievance representation." *Id*. But the court also pointed to Nev Rev Stat 288.140(2),[12] which "authorize[d] a nonunion member to act on his own behalf 'with respect to any condition of his employment.' " *Id*. at 478. *Cone* held that, as a result, such language "provides an individual with a right to forego union representation" and this carried with it an implicit "requisite that a nonunion member pay for pursuing his or her own grievance, even if such payment is made to the union." *Id*. at 478. Accordingly, from a statutory interpretation perspective, *Cone* concluded that there was no express prohibition of the fees at issue.

---

[11] During the period that *Cone* was pending on appeal, Nev Rev Stat 288.027 was replaced by Nev Rev Stat 288.133, but the new statute still defines a bargaining agent as "the exclusive representative of all local government employees in the bargaining unit for purposes of collective bargaining."

[12] Nev Rev Stat 288.140(2) provides as follows:

> The recognition of an employee organization for negotiation, pursuant to this chapter, does not preclude any local government employee who is not a member of that employee organization from acting for himself or herself with respect to any condition of his or her employment, *but any action taken on a request or in adjustment of a grievance shall be consistent with the terms of an applicable negotiated agreement*, if any. [Emphasis added.]

*Cone* next turned to the duty of fair representation derived from Nev Rev Stat 288.140(1)[13] and Nev Rev Stat 288.270(2)[14] and concluded that the grievance fee policy did not violate the duty. The court concluded that there was "no discrimination or coercion" by "requiring nonunion members to pay reasonable costs associated with individual grievance representation . . . ." *Id*. at 479. In support of this, the court cited *Opinion of the Justices*, 401 A2d 135 (Me, 1979), and *Schaffer v Bd of Ed of City of St Louis*, 869 SW2d 163, 166 (Mo App, 1993), but neither of those decisions considered whether such a fee violates a union's duty of fair representation.

*Cone* found that the exclusive bargaining relationship between the union and employee members of the collective bargaining unit established a "mutuality of obligation[,]" which the court described as the union's obligation to represent all employees in the bargaining unit regardless of union membership status, and the employee's obligation, if permitted by the collective bargaining agreement and union

---

[13] Nev Rev Stat 288.140(1) provided that:

> It is the right of every local government employee, subject to the limitation provided in subsection 3, to join any employee organization of the employee's choice or to refrain from joining any employee organization. A local government employer shall not discriminate in any way among its employees on account of membership or nonmembership in an employee organization.

[14] When *Cone* was decided, Nev Rev Stat 288.270(2)(c) prohibited a union representing public sector employees from discriminating against an employee "because of race, color, religion, sex, age, physical or visual handicap, national origin or *because of political or personal reasons or affiliations*." (Emphasis added.) MCL 423.210(2) does not contain an analogous provision, but it does prohibit a union from "caus[ing] or attempt[ing] to cause a public employer to discriminate against a public employee in violation of subsection (1)(c)." MCL 423.210(2)(c).

26

policy, to share in the costs of collective bargaining services. *Cone*, 116 Nev at 479. According to *Cone*, "recognition of this mutuality of obligation will, in part, serve to discourage 'free riders'—employees who receive the benefits of union representation but are unwilling to contribute to its financial support." *Id*. at 480. *Cone* also explicitly rejected contrary authority from the NLRB, holding that it was not bound by such authority and that the court disagreed with it "because it leads to an inequitable result that we cannot condone, by essentially requiring union members to shoulder the burden of costs associated with nonunion members' individual grievance representation." *Id*. Therefore, *Cone* held "that the union did not discriminate against nonmembers in enacting the policy[] and that the policy merely recognized the mutuality of obligation that may arise under an exclusive bargaining arrangement." *Id*.

We have located only one intermediate appellate court decision that expressly adopted the same rationale as *Cone*. See *Perry v Int'l Longshoremen Ass'n Local No 1414*, 295 Ga App 799, 801; 673 SE2d 302 (2009) ("Just as the union has an obligation to provide referrals for all employees, whether members or not, all employees obtaining jobs at the [union] hall should be obliged to pay their share of its costs."). The private sector union in *Perry* charged different fees to members than to nonmembers for providing referrals for temporary work, and the court explicitly noted that following a settlement with the NLRB concerning the same claims and fees, the union had begun charging union members and nonunion members the same referral fee. *Id*. at 800-801.

The decisions in *Cone* and *Perry* both preceded the United States Supreme Court's ruling in *Janus*. *Janus* concerned a challenge to an Illinois statute that authorized unions representing public sector employees to charge nonunion members an agency fee for the

27

proportionate share of union dues that would be attributable to collective bargaining activities performed by the union on behalf of all employees within a bargaining unit. The Court struck down this statute as violating the First Amendment right of nonmember public employees by "compelling them to subsidize private speech on matters of substantial public concern." *Janus*, 585 US at 885-886. In doing so, the Court expressly overruled *Abood*, which had previously upheld a very similar statute.[15] *Id*. at 886. The *Janus* Court specifically addressed the history of free-rider problems:

> In any event, whatever unwanted burden is imposed by the representation of nonmembers in disciplinary matters can be eliminated "through means significantly less restrictive of associational freedoms" than the imposition of agency fees. *Harris*, 573 [US at 648-649] (internal quotation marks omitted). Individual nonmembers could be required to pay for that service or could be denied union representation altogether. Thus, agency fees cannot be sustained on the ground that unions would otherwise be unwilling to represent nonmembers.

> Nor can such fees be justified on the ground that it would otherwise be unfair to require a union to bear the duty of fair representation. That duty is a necessary concomitant of the authority that a union seeks when it chooses to serve as the exclusive representative of all the employees in a unit. As explained, designating a union as the exclusive representative of nonmembers substantially restricts the nonmembers' rights. *Supra*, at 2460-2461. Protection of their interests is placed in the hands of the union, and if the union were free to disregard or even work against those interests, these employees would be wholly unprotected. That is why we said many years ago that serious "constitutional questions [would] arise" if the union were *not* subject to the duty to represent all employees fairly. *Steele*, [323 US] at 198.

> In sum, we do not see any reason to treat the free-rider interest any differently in the agency-fee context than in any other First Amendment

---

[15] Notably, while *Cone* did not rely on *Abood*, two of the cases it relied heavily on— *Schaffer*, 869 SW2d 163, and *Opinion of Justices*, 401 A2d 135—both heavily cited and relied on *Abood*.

28

context.  See *Knox*, 567 U.S., at 311, 321.  We therefore hold that agency fees cannot be upheld on free-rider grounds.  [*Janus*, 585 US at 900-901 (some citations omitted).]

As an example of a situation in which individuals could be required to pay for union services or be denied the service, a single footnote in *Janus* noted that

> [s]ome States have laws providing that, if an employee with a religious objection to paying an agency fee "requests the [union] to use the grievance procedure or arbitration procedure on the employee's behalf, the [union] is authorized to charge the employee for the reasonable cost of using such procedure."  E.g., Cal. Govt. Code Ann. § 3546.3 (West 2010); cf. Ill. Comp. Stat., ch. 5, § 315/6(g) (2016).  This more tailored alternative, if applied to other objectors, would prevent free ridership while imposing a lesser burden on First Amendment rights.  [*Janus*, 585 US at 901 n 6.]

The Union here has also pointed to one post-*Janus* decision from an intermediate appellate court in Pennsylvania as support for its argument.  In *Taylor v Pennsylvania State Corrections Officers Ass'n*, 291 A3d 1204; 2023 Pa Super 44 (2023), the court upheld a pay-for-service grievance policy that is very similar to the one at issue here.  The state's own version of PERA made the Pennsylvania State Corrections Officers Association (PSCOA) the "exclusive representative" of the plaintiff's bargaining unit.  See 43 Pa Con Stat Ann 1101.606.  Post-*Janus*, the PSCOA adopted a fee schedule for grievance proceedings that applied to only nonunion employees within the bargaining unit, which was challenged by the plaintiff as violating the duty of fair representation.  *Taylor* specifically held that "there is no support under Pennsylvania law for Mr. Taylor's broad contention that PSCOA is not permitted to charge ancillary fees to non-union members in connection with representing such individuals in the context of employment grievances."  *Taylor*, 291 A3d at 1211.

*Taylor* read *Janus*, which precluded PSCOA from charging mandatory agency fees for collective bargaining costs and contract administration as a condition of employment, as specifically authorizing the "assessment of individual fees associated with a union's representation of a non-member . . . ." *Id*. at 1212. While *Taylor* held that the existence of such a pay-for-service grievance scheme was not a per se violation of the duty of fair representation, it left the door open to challenges premised on allegations that the fees were "excessive or unrelated to the prospective grievance and arbitration proceedings." *Id*.

### 3. GRIEVANCE FEES CHARGED TO ONLY NONUNION PUBLIC EMPLOYEES VIOLATE MICHIGAN'S DUTY OF FAIR REPRESENTATION ABSENT EXPRESS LEGISLATIVE AUTHORIZATION

Unions representing public sector employees have the power and obligation to represent all employees within a bargaining unit, regardless of union membership. It is precisely because of this that the duty of fair representation is an important complement to statutorily proscribed unfair labor practices. This does not necessarily mean that nonunion employees of a bargaining unit must always be treated the same as union members in all regards. For example, MERC has held that a union subject to PERA does not violate the duty of fair representation "by suspending or expelling members from the union, restricting attendance at union meetings to members, prohibiting nonmembers from voting in internal union elections, and enforcing other restrictions against nonmembers, as long as those requirements do not have a direct effect on terms and conditions of employment." *In re AFSCME Council 25 Local 1583*, MERC Decision & Order (Case Nos. CU13-011 to CU13-013), issued March 27, 2014, p 9.

But grievance administration is different. Grievance processing and arbitration are a critical aspect of the collective bargaining process, *Machinists, Local 697*, 223 NLRB at 834, through which unions wield significant power as the exclusive representatives of a bargaining unit. It is thus unsurprising that a contractual grievance procedure is a universal feature of collective bargaining agreements. Through the bargaining process, unions and employers determine how employees can resolve disputes to enforce their contractual rights set forth in the collective bargaining agreement, and through the exercise of its discretionary authority as the exclusive representative, a union determines whether and how far to pursue each grievance. See *Goolsby*, 419 Mich 665-669; *Lowe v Hotel & Restaurant Employees Union*, 389 Mich 123, 147; 205 NW2d 167 (1973). Thus, the way the grievance process is implemented by the exclusive representative of employees bears directly on the fruits of collective bargaining. See *Grand Rapids v Grand Rapids Lodge No 97, Fraternal Order of Police*, 415 Mich 628, 647; 330 NW2d 52 (1982) ("As the exclusive bargaining representative, the union has an inherent interest in an individual's grievance.").

The pay-for-service fee policy that the Union seeks to uphold here violates the duty of fair representation for several reasons. First, when a union exercises its authority in a way that treats the prospective grievance of two employees within a bargaining unit differently in substantial and material ways based solely on union membership status, the duty of fair representation will typically be violated. This is because a "union practice that principally looks to union membership or nonmembership to determine the *type of representation that will be provided* [to] bargaining unit employees is discriminatory." *Nat'l Treasury Employees Union v Fed Labor Relations Auth*, 721 F2d 1402, 1406 (CA

DC, 1983) (holding that a union, as an exclusive bargaining agent, may not provide attorney representation solely to union members). A union generally cannot discriminate "on the ground of non-membership." *Thompson v Brotherhood of Sleeping Car Porters*, 316 F2d 191, 199 (CA 4, 1963).

Second, under *Goolsby* and *Lowe*, when exercising its discretion as to whether a grievance should be processed or pursued, a union must at least make a preliminary determination as to the merits of the grievance before deciding whether to pursue it. The Union's policy here requires no such initial determination and, in fact, would allow the Union to completely ignore a nonmember's grievance unless and until the nonmember pays the fee demanded.

While the Union claims that it is not refusing to handle any grievances but is merely demanding compensation to offset costs, we agree with Renner that this position is more a matter of semantics. The fact that a fee must be paid before the Union will render a decision as to whether a nonmember's grievance will even be pursued violates the duty of fair representation.[16] This effectively deprives nonunion members of access to the contractual grievance process unless and until they pay a fee that union members are not required to pay, regardless of the length of their membership. See *Machinists, Local 697*, 223 NLRB at 834 ("[A]lthough a union is permitted wide discretion in its handling of grievances, a

---

[16] In this opinion, we do not address whether, in a post-*Janus* world, a pay-for-service fee scheme that applies to both union members and nonunion members in a substantially similar way violates the duty of fair representation. Cf. *San Francisco Federation of Teachers*, 6 Pub Employee Rep for California 13159 (1982) (holding that a similar pay-for-service fee policy violated the duty of fair representation because the union did "not condition the processing of arbitration by dues-paying members on their paying a specific fee for arbitration" and, thus, the policy discriminated against nonunion members).

32

union cannot lawfully refuse to process a grievance of an employee in the unit because he is a nonmember.").

Third, we agree with the long line of decisions from the NLRB beginning with *Hughes Tool Co*, 104 NLRB 318, concluding that charging only nonunion employees within a bargaining unit for services that union members receive as a part of annual dues is antithetical to the exclusive representative status of unions. As noted in *Hughes Tool Co*, when the payment of a fee by a nonunion employee is required before an exclusive representative will even consider the employee's grievance, the employee faces a stark choice to either "pay a price for such help or to forego it entirely." *Id*. at 327 (emphasis omitted). We are cognizant of the financial hardships for unions created by the prospect of free riders, and such problems are unlikely to dissipate after *Janus*. The ability of a union to collectively represent employees is dependent on employees sharing the burden of supporting that representation through the payment of dues.

As an exclusive representative, however, unions take on the responsibility of representing all employees, even those who withhold their financial support. See *Machinists Local 697*, 223 NLRB at 834 (holding that a union "take[s] on the responsibility to act as a genuine representative of all the employees in the bargaining unit, irrespective of union membership or the existence of a union security contract") (cleaned up). The practical reality of a pay-for-service fee policy for grievance administration by nonunion employees is that the exclusive representative is "refusing representation to some of the employees in a group except as a hired agent." *Hughes*, 104 NLRB at 328. We therefore hold that the duty of fair representation does not permit this form of discriminatory

treatment between union members and nonmembers in the absence of express legislation authorizing such charges by public sector unions.

We also are not persuaded by the Union's reliance on *Cone*, *Taylor*, and footnote 6 of *Janus*. The overturning of *Abood* by *Janus* calls into question the continued viability of the "fair share" principles that *Cone*, 116 Nev 473, *Schaffer*, 869 SW2d 163, and *Opinion of Justices*, 401 A2d 135, relied on in upholding fee policies that applied to only nonunion public sector employees. Additionally, the statute critical to the court's analysis in *Cone*, Nev Rev Stat 288.140(2), differs from MCL 423.211. In Michigan, MCL 423.211 has long been interpreted to require that the union must be the exclusive bargaining representative of the entire bargaining unit. See, e.g., *Detroit Bd of Ed v Parks*, 417 Mich 268, 275-279; 335 NW2d 641 (1983); *Quinn v Police Officers Labor Council*, 456 Mich 478, 481-482; 572 NW2d 641 (1998); *Demings v City of Ecorse*, 127 Mich App 608, 616; 339 NW2d 498 (1983), aff'd in part and remanded in part 423 Mich 49 (1985).

As the Court of Appeals noted, *Renner*, 335 Mich App at 300 n 3, 311, *Cone*'s reading of the Nevada statute does not appear to require an employee to use the specific grievance procedure that a union has bargained for. By contrast, nothing in MCL 423.211 allows an employee to avoid using the specific grievance procedure set forth in a collective bargaining agreement. Moreover, while MCL 423.211 gives an employee the power to present a grievance directly to an employer without the intervention of a bargaining representative, because the statute "requires an individual adjustment to be consistent with the collective bargaining agreement, the employer may elect to proceed under the agreement's procedures in the first place rather than risk rebargaining over the same

34

issues." *Mellon v Bd of Ed of Fitzgerald Pub Sch*, 22 Mich App 218, 221-222; 177 NW2d 187 (1970) (emphasis omitted).

The Union further argues that *Janus* provides express authorization for the type of pay-for-service fee policy that is at issue and removed the duty of fair representation from the equation for grievance processing purposes. As support, the Union points to the *Taylor* decision from the Pennsylvania Superior Court. We do not read *Janus* so broadly, and we disagree with *Taylor*. *Janus* certainly suggested that charging individual nonmember employees fees for specific services that a union provides would survive a First Amendment challenge, but any speculation beyond that was dicta considering that only the constitutional question was before the Court. Additionally, *Janus* did not analyze whether such fees would be consistent with the duty of fair representation, despite reaffirming the importance of the duty and the constitutionality of legislation making a union the exclusive representative of a bargaining unit.

Moreover, *Janus* cited two examples authorizing fair-share fees to be charged for the costs associated with representative union services. See *Janus*, 585 US at 901 n 6, citing Cal Gov't Code, ch 10.7, § 3546.3 (1980); cf. 5 Ill Comp Stat 315/6(g) (2016). Both involved statutory permission to charge the fees. Michigan's Legislature did not include similar express authorization for a fair-share fee schedule in the applicable version of PERA, nor was such authorization included in 2023 PA 9 and 2023 PA 114, which largely returned PERA to its pre-2012 status. This distinction is critical because, as previously explained, the NLRB has consistently held that to avoid a violation of the duty of fair representation under the NLRA, there must be an express union security agreement or legislative authorization to charge nonunion members of a bargaining unit for services that

35

union members receive as part of paying their annual dues. See *Hughes Tool Co*, 104 NLRB 318; *Buckeye Florida Corp*, 362 NLRB 1649. While there might be creative legislative solutions that could assist public and private labor organizations with addressing the longstanding free-rider problem, we decline to erode the duty of fair representation in the manner the Union asks of the Court today.

## C. APPLICATION

In accordance with the principles discussed above, we strike down the Union's pay-for-service fee policy as a violation of the duty of fair representation. The fee policy applies to only nonunion employees within the relevant bargaining unit, such as Renner, and deprives those nonunion employees of access to the grievance administration process that they are compelled to use pursuant to the collective bargaining agreement unless they pay the demanded fee. The Union also has not obligated itself to make an initial assessment of the potential merit of a nonunion employee's grievance unless and until the required fee has been paid. Under such circumstances, the Union's fee policy violates the duty of fair representation. We reject the Union's argument that dicta in *Janus* authorized the pay-for-service fee policy at issue for the reasons previously stated.

Our holding that the fee policy violates the duty of fair representation makes it unnecessary to determine if the fee policy also violated § 9 or § 10 of PERA as a statutorily proscribed unfair labor practice.

## IV. CONCLUSION

For the reasons previously explained, we strike down the Union's pay-for-service fee policy because it violates the Union's duty of fair representation, which makes it

36

unnecessary to reach the issue of whether the pay-for-service fee policy also constitutes an unfair labor practice in violation of § 9 or § 10 of PERA. We affirm the analysis and holding contained in Part III of the Court of Appeals' opinion to the extent it held that the Union's pay-for-service fee policy was invalid on the basis that it violated the duty of fair representation, and we affirm the Court of Appeals' analysis and conclusion that *Janus* did not hold that a union can unilaterally fashion a policy or procedure imposing fees for services on only nonunion employees. See *Renner*, 335 Mich App at 308-318. Considering our holding as to the duty of fair representation and the recent substantive amendments of PERA enacted by 2023 PA 9 and 2023 PA 114, we vacate as unnecessary the Court of Appeals analysis and holdings as to the alleged violations of § 9 and § 10 of PERA. *Renner*, 335 Mich App at 302-307.

We conclude that MERC's findings of fact in this case were supported by competent, material, and substantial evidence on the whole record. To the extent MERC's conclusions of law reflected a finding that the pay-for-services fee policy violated the duty of fair representation, this decision does not constitute a substantial and material error of law, nor does it violate a statutory or constitutional provision. However, consistent with how we have handled the Court of Appeals' decision, we vacate MERC's conclusions of law to the extent that MERC also determined that the pay-for-services fee policy violated § 9 and § 10 of PERA. With these qualifications, the decision of MERC is affirmed.

Elizabeth M. Welch
Elizabeth T. Clement
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Kyra H. Bolden
